**FOR PUBLICATION**

## SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **PEOPLE OF THE VIRGIN ISLANDS,** | ) | **CASE NO. SX-2012-CR-065** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JOSE RIVERA,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Cite as: 2020 VI Super 64

**Appearances:**

**JOSEPH PONTEEN, ESQ.**
Chief Deputy Attorney General
Virgin Islands Department of Justice
Christiansted, VI 00820
*For People of the Virgin Islands*

**GORDON C. RHEA, ESQ.**
Gordon C. Rhea, P.C.
St. Thomas, VI 00803
*For Jose Rivera*

**MICHAEL C. JOSEPH, ESQ.**
Kingshill VI, 00851
*For Jose Rivera*

## MEMORANDUM OPINION
(Filed June 3, 2020)

**DONOHUE, SR., Senior Sitting Judge:**

¶1     **BEFORE THE COURT** is a motion for new trial based on newly-discovered evidence filed by Defendant Jose Rivera. Rivera's co-Defendant, Jose Ventura, joined in the motion. *See People v. Rivera*, 68 V.I. 393, 422 (Super. Ct. 2018) (construing motion to join as notice of joinder). The People of the Virgin Islands oppose. For the reasons stated below, Rivera's motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      "The factual and procedural background of this case has been summarized in prior opinions of this

Court and the Virgin Islands Supreme Court. Ventura and Rivera were charged and convicted of first-

degree murder for the 2001 kidnapping and killing of Virgin Islands Police Corporal Wendell Williams."

*People v. Ventura*, 2020 VI Super 63, ¶ 2 (citations omitted). The People's main witness, and the only

eyewitness, was Theresa Coogle. Both Defendants "moved for judgment of acquittal after the jury returned

its verdict, which this Court denied." *Id.* "Ventura also moved for a new trial, which the Court denied 'but

not on the merits. Rather, because Ventura's motion was untimely filed, the Court declined to address the

substance.'" *Id.* (ellipsis omitted) (quoting *Rivera*, 68 V.I. at 397 (Super. Ct. 2018)). "Ventura and Rivera

each were sentenced to a term of imprisonment for life." *Id.* They appealed and their convictions were

affirmed. *See generally Rivera v. People*, 64 V.I. 540 (2016); *Ventura v. People*, 64 V.I. 589 (2016). Both

cases were remanded, however, for "the Superior Court to make a determination on Ventura's motion for

a new trial . . . ." *Rivera*, 64 V.I. at 586 (citing *Ventura*, 64 V.I. at 617).

¶3      After the cases were remanded, Rivera filed his own motion for a new trial based partly on newly-

discovered evidence and on an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Attached to

his January 30, 2017 motion are ten exhibits: (1) a July 23, 2014 affidavit of Francisco Velasquez; (2) a

March 26, 2014 affidavit of Kenny Melendez; (3) paystubs for Theresa Coagle [sic] showing 27.91 hours

worked for Bal – Rod Enterprises, Inc. in Miami, Florida during the period June 25, 2001 to July 8, 2001;

(4) an April 8, 2001 emergency services physician record of Jackson Memorial Hospital in Miami for an

8 month-old child; (5) an August 11, 2016 affidavit of former Virgin Islands Police Officer Jose A.

Rodriguez; (6) copies of court-issued subpoenas sent on April 15, 2014 to the Office of Customs and

Border Protection ("CBP") in Miami by Rivera, requesting all records relating to Coogle's border

crossings between January 1, 2001 and December 31, 2002, and the responses from that Office; (7)

correspondence with CBP pertaining to Rivera's internal appeal from the denial of his request (really subpoena) for Coogle's border-crossing records; (8) February 2015 correspondence between Rivera's counsel and the former prosecutor, Kippy Roberson, Esq., who tried the case, acknowledging that an FBI agent, Special Agent Tom Calhoun, was aware at the time of trial of allegations that Coogle was not on St. Croix at the time of Williams's murder, and further acknowledging that Agent Calhoun did due diligence but found no record of Coogle having left St. Croix during the relevant time period; (9) June 2015 correspondence from Rivera's counsel to the former United States Attorney for the District of the Virgin Islands, Ronald W. Sharpe, regarding Agent Calhoun's lack of response to counsel's correspondence sent in February and May, 2015; and (10) February 2015 correspondence between Rivera's counsel and Roberson regarding Coogle having retained counsel in Florida to assist her in obtaining potential reward funds for testifying.

¶4     Ventura joined in Rivera's motion. The People responded, untimely, in opposition, which prompted several ancillary motions. *See generally Rivera*, 68 V.I. 401-02. Once Rivera's motion was fully briefed, the Court scheduled an evidentiary hearing, initially for May 16, 2018, continued to June 14, 2018 due to scheduling conflicts of counsel. *See generally People v. Rivera*, 68 V.I. 552 (Super. Ct. 2018). Both Defendants appeared in person and with counsel at the June 14, 2018 evidentiary hearing. Rivera did not call any witness or move any documents moved into evidence. The People called Virgin Islands Police Detective Frankie Ortiz as a witness. The Court took the motion and arguments under advisement. Rivera filed a supplemental brief after the hearing without leave of court or objection from Ventura or the People. Nothing further has come before the Court to date.

## DISCUSSION

¶5     The Superior Court may grant a new trial based on newly-discovered evidence once "five requirements are met . . . ." *Phillips v. People*, 51 V.I. 258, 280 (2009) (quoting *United States v. Cimera*,

459 F.3d 452, 458 (3d Cir. 2006)). First, "the evidence must be in fact, newly discovered, i.e., discovered since the trial[.]" *Id.* (citation omitted). Seeing evidence admitted at trial in a different light or realizing something after trial about the evidence admitted during trial does not make that evidence newly-discovered. *Cf. Cimera*, 459 F.3d at 461-62. Second, the defendant must show he or she was diligent in discovering the new evidence. *See Phillips*, 51 V.I. at 280. But "evidence is not 'newly discovered' if it 'was actually known or could have been known by the diligence of the defendant or his counsel.'" *Cimera*, 459 F.3d at 461 (brackets omitted) (quoting *United States v. Bujese*, 371 F.2d 120, 125 (3d Cir. 1967)). Third, the newly-discovered "evidence . . . must not be merely cumulative or impeaching[.]" *Phillips*, 51 V.I. at 280 (citation omitted). Fourth, the newly-discovered evidence must be "material to the issues involved[.]" *Id.* (citation omitted). Finally, the newly-discovered evidence must be "of such a nature . . . that, on a new trial, the newly discovered evidence would probably produce an acquittal." *Id.* (citation omitted). The defendant carries the burden of proof and that burden is "a 'heavy burden' . . . ." *Id.* (citation omitted). But "[m]otions for a new trial 'are not favored and should be granted sparingly and only in exceptional cases.'" *Wallace v. People*, 71 V.I. 703, 723 (2019) (quoting *Stevens v. People*, 52 V.I. 294, 305 (2009)). For that reason, "'[c]ourts justifiably look upon after-discovered evidence with skepticism and suspicion and do not generally grant new trials based on such grounds." *Id.* (quoting *Phillips*, 51 V.I. at 280).

¶6      Before proceeding to address Rivera's arguments, the Court must first address the posture of this case. Virgin Islands precedent is silent regarding the specific steps courts should take when presented with a post-conviction motion for new trial based on newly-discovered evidence. Generally-speaking, when "there is a factual dispute . . . the court must conduct a plenary evidentiary hearing in order to resolve that dispute.'" *Ernest v. Morris*, 64 V.I. 627, 643 (2016) (ellipsis omitted) (quoting *Boynes v. Transp. Servs of St. John, Inc.*, 60 V.I. 453, 465 (2014)). That much is clear. But whether the defendant must make a

threshold showing before a hearing is required is not clear. Courts in other jurisdictions have held that a defendant must make a threshold before a hearing is warranted. *See, e.g., Nordelo v. State*, 93 So. 3d 178, 184-86 (Fla. 2012) (describing three-step process for evaluating post-conviction motions); *Reise v. State*, 913 A.2d 1052, 1056 (R.I. 2007) (describing two-part, multifaceted test for evaluating post-conviction motions). *Nordelo* and *Reise*, as two examples, concur that an evidentiary hearing is necessary only if the defendant satisfies this threshold burden. *See Reise*, 913 at 1056 ("If the threshold test has been satisfied, the hearing justice must then determine, in his or her discretion, whether or not the newly discovered evidence is sufficiently credible to warrant relief. . . . [O]rdinarily this latter determination is, out of necessity, made in the context of an evidentiary hearing." (citations omitted)); *Nordelo*, 93 So. 2d at 185 ("The determination of whether the statements in an affidavit provided as newly discovered evidence are true and meet the due diligence and probability prongs of *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) 'usually requires an evidentiary hearing to evaluate credibility unless the affidavit is inherently incredible or obviously immaterial to the verdict and sentence.'" (parenthetical abbreviation and quotation omitted)).

¶7     In this instance, however, the Court did not conclude that Rivera had satisfied a threshold burden before scheduling a hearing. Instead, the Court scheduled an evidentiary hearing out of an abundance of caution. *Accord State v. Blakely*, 2019-Ohio-1483, ¶ 8 (Ct. App.) ("The trial court exercises its discretion in determining whether an evidentiary hearing is required based on the evidence offered in support of the motion."); *see also, e.g., Gov't of V.I. v. Lima*, 774 F.2d 1245, 1251 (3d Cir. 1985) ("It would, of course, have been simple to convene a hearing and bring Molina in to testify. We think that would have been the better course for the district court to have followed."); *State v. Forte*, No. COA06-904, 2007 N.C. App. LEXIS 550, *16 (Ct. App. Mar. 20, 2007) ("An evidentiary hearing is required to determine if defendant's newly discovered evidence warrants a new trial."). But the problem is that Rivera did not take advantage of the opportunity to present any evidence. Simply put, Rivera placed nothing on the record at the June

14, 2018 evidentiary hearing. Binding precedent is clear that Rivera had the burden of proof here. *See Phillips*, 51 V.I. at 280 ("Although the decision to grant or deny a motion for a new trial lies within the discretion of the district court, the movant has a "heavy burden" of proving each of these requirements." (quoting *Cimera*, 459 F.3d at 458)). Rivera's attorney, Gordon C. Rhea, Esq., did authenticate the email correspondence between himself and the former prosecutor, Attorney Roberson. But he did not subpoena Attorney Roberson, for example, to testify and failed to move the affidavits into evidence. "'[E]vidence' is defined as . . . 'something that tends to prove or disprove the existence of an alleged fact.'" *Wallace*, 71 V.I. at 757 n.26 (Swan, J., dissenting) (quoting Black's Law Dictionary 595 (8th ed. 2004)). Thus, for newly-discovered evidence to become "evidence" a hearing must occur in which witnesses testify and documents are admitted. That did not happen here. As a result, Rivera may have failed to carry his burden of proof. Nonetheless, given the lack of binding precedent in this area, the Court will review the materials Rivera attached to his motion because, even if Rivera had called witnesses or moved the documents attached to his motion into evidence, it would not have entitled him to a new trial.

¶8     First, there is no dispute that the "evidence" Rivera submitted in support of his motion is new. Kenny Melendez, Francisco Velasquez, and Jose A. Rodriguez did not testify at trial. The specific information they swore to in their affidavits was not before the jury. Similarly, documents concerning Coogle's job in Miami were not in evidence. Likewise, Agent Calhoun did not testify, nor were the FBI agents who did testify questioned about Coogle's border crossings. Of course, the prosecutor, Attorney Roberson, also did not testify at trial about his knowledge of Coogle's border crossings or when Agent Calhoun first told him, or his predecessors, about the absence of documentation tending to prove or disprove Coogle's assertion that she traveled back and forth between Florida and the Virgin Islands around the time of the murder.

¶9     Yet, even though Rivera's evidence may be "new," it does not qualify, from a legal standpoint, as

newly-discovered evidence. "The test to determine whether evidence is 'newly discovered' is both objective and subjective . . . ." *Cimera*, 459 F.3d at 461. There is nothing in the record to establish that Rivera and his counsel were subjectively unaware that Coogle may not have been on St. Croix when Williams was murdered. In fact, the record shows the exact opposite. "Defendants . . . brought out on cross-examination that Coogle was living in Miami, Florida with Mariela Velasquez, Max Velasquez's sister, where she worked at Wendy's Restaurant." *People v. Rivera*, SX-2012-CR-065, 2014 V.I. LEXIS 49, * 6 (V.I. Super. Ct. May 1, 2014). Rivera also called Mariela as a witness to testify in his defense. She testified that Coogle "eventually moved in with [her] and got a job in April 2001 working at Wendy's in North Miami. Mariela Velasquez testified that Coogle slept by her apartment every night and stayed there with her until she delivered her second child in July 2001. According to Mariela Velasquez, Coogle did not leave Miami until October 2001." *Id.* at *10 (citations omitted). Thus, the affidavit of Mariela's brother, Francisco Velasquez, is both cumulative and impeaching. Moreover, as the People pointed out during the hearing, Francisco returned to St. Croix from Miami in October 2001, and should have been available to testify at trial as well as at the evidentiary hearing.

¶10     Similarly, the affidavit of Kenny Melendez, Coogle's "so-called five-week lover," (Hr'g Tr. 29:5 (June 14, 2018)), is also cumulative and impeaching. Rivera called Coogle's sister, Sandra Rivera, to testify in his defense. Sandra testified that she "recalled last seeing her sister Theresa on St. Croix in April 2001. She claimed to know 'to a degree of certainty' that her sister was not on St. Croix in June 2001 because Theresa did not attend their mother's birthday party and . . . sent pictures and letters from Miami." *Rivera*, 2014 V.I. LEXIS 49 at *12 (citations omitted). But Sandra admitted on cross-examination that "she could not 'positively, definitively' say that in June 2001 her sister never got on an airplane and flew back to St. Croix for a visit." *Id.* (citation omitted). The affidavit of Kenny Melendez, claiming that as his relationship with Coogle got more serious in June 2001, he saw her every day and would have "known

about her traveling to the Virgin Islands," (Melendez Affid., ¶ 14 (Mar. 26, 2014), *attached as* Ex. 2 to

Def.'s Mem. of Law in Supp. of Rule 135 Mot. for New Trial, filed Jan. 30, 2017 (hereinafter "Mot.")),

is cumulative and impeaching. Moreover, Melendez states in his affidavit that Mariela "contacted [him]

through Facebook and told [him] about what had happened to her brother who was charged along with

four other people." *Id.* ¶ 17. While Melendez did not say when Mariela contacted him, it still shows that

Mariela, who testified at trial, would have known that Melendez could have helpful information. Nothing

in the record establishes that Rivera or his attorney were unable to reach Melendez before trial.

¶11     Furthermore, in addition to being cumulative and impeaching, the Court also finds that Rivera was

not diligent concerning either Melendez's or Francisco's affidavits. Rivera concedes in his motion that

"no Virgin Islands cases discuss the due diligence standard for evaluating whether evidence discovered

after trial qualifies as newly discovered . . . ." (Mot. 14.) He suggests relying on federal precedent to

interpret the similar rule. *See id.* ("[T]he standard is set forth in Federal cases dealing with a comparable

requirement in Rule 33 of the Federal Rules of Criminal Procedure."). But even under that standard, Rivera

was not diligent. Rivera contends that federal precedent "hold[s] that a motion for new trial on the grounds

of newly discovered evidence should be granted if the evidence was unknown at the time of trial and the

Defendant used due diligence to learn of the evidence at an earlier time." *Id.* (citing *United States v.

Deavault*, 190 F.3d 926, 929 (8th Cir. 1999)). Rivera contends that "he filed numerous motions in an effort

to learn who the informant was, and when her identity was ultimately revealed, moved heaven and earth

to locate witnesses who could testify that she was in Florida at the time of the killing." *Id.* at 14-15. Yet

Melendez signed his affidavit on March 26, 2014, approximately a week before Rivera was sentenced.

Rivera waited nearly three years to present it to the Court. Francisco, who was on St. Croix, signed his

affidavit on July 23, 2014. Yet, Rivera waited over two years to present it to the Court. The Court

acknowledges that Rivera may have elected to avoid a piecemeal submission, opting instead to submit all

evidence he could gather. But it was on Rivera to explain that as a reason for the delay. More importantly, the evidence regarding Coogle's potential absence from St. Croix was not "unknown at the time of trial."

¶12    The Court also rejects the affidavit of Jose A. Rodriguez. Mr. Rodriguez gave sworn statements as a former police officer, claiming to have knowledge that Detective Ortiz is corrupt with "strong affiliations to known drug dealers . . . ." (Rodriguez Affid. (Aug. 11, 2016, attached as Ex. 5 to Mot.) Rodriguez further avers that in his "personal opinion" "Mr. Rivera's arrest, the evidence withheld at trial, his conviction and the totality of the case itself is . . . a result of the willful and deliberate tampering with evidence by these individuals within the Virgin Islands police department . . . ." *Id.* First, the Court takes judicial notice that Mr. Rodriguez was arrested in 2007 and charged and convicted of several felonies involving a minor female. *See generally Rodriguez v. People*, 71 V.I. 577 (2019). Rodriguez's credibility is in doubt. More importantly, the jury heard testimony from Williams's sister, Jaslene Williams, "who . . . believed that the VIPD might have been involved in her brother's disappearance." *Rivera*, 2014 V.I. LEXIS 49 at *7. Certainly, evidence regarding corrupt police practices can constitute newly-discovered evidence under certain circumstances. *See, e.g., Commonwealth v. Ellis*, 57 N.E.3d 1000, 1015-16 (Mass. 2016). But Rodriguez does not swear to any specific facts in his affidavit, just his "personal opinion." For this reason, the Court finds Rodriguez's affidavit immaterial to the issues involved here.

¶13    Next, concerning the April 2001 emergency room records of Coogle's daughter and the June 2001 employment records of Bal – Rod Enterprises, Inc., presumably the entity that operated the Wendy's franchise Coogle worked for in Miami – both matters were known to the Defendants before trial and addressed at trial. Rivera asked Coogle on cross-examination if she moved to Miami "because [her] young daughter was having some kind of an ear problem . . . ." (Trial Tr. 76:2-3 (Jan. 29, 2014).) Coogle denied that she moved to Miami, she was simply staying there, and denied that her daughter's medical issue was the reason why. Rivera then asked Coogle about having worked at Wendy's, which she admitted. *See id.*

at 76:13 ("When I was in Miami, I did work at a Wendy's, yes."). The People concede that Coogle resided in Florida for a period of time. (*See* Hr'g Tr. 28:6-8 (June 14, 2018) ("[T]he People would not contradict that the witness, Ms. Coogle, in this matter, resided in Florida for a certain period of time.").) The record is undisputed that Coogle was in Miami for a time. Whether she returned to St. Croix before Williams was killed, how long she was on St. Croix if she did, and how and when she left – those are the questions in dispute. Coogle's daughter's medical records sheds no light on these questions and is cumulative and, thus, not newly-discovered evidence. Likewise, Coogle's paystub from Wendy's is also cumulative. It shows that she worked a total of 27.91 hours during a two-week pay period between June 25, 2001 and July 8, 2001. In a vacuum, this information is cumulative, impeaching, and more importantly, unhelpful. The Court is left to speculate which days Coogle worked during the pay period and whether she worked eight-hour shifts, four-hour shifts, or something in between. As the People correctly point out, "[n]ewly discovered evidence would be something like a video, something like a record, something like a signature to show that on the date she claims she was on St. Croix that she was actually someplace else . . . ." *Id.* at 30:25-31:3. Had the paystub showed that Coogle worked 80.00 hours during this timeframe, that might be more persuasive. But even assuming that Coogle put in an eight-hour shift on Monday, June 26, 2001— that would not refute her testimony that she was on St. Croix two weeks earlier. Rivera forgets that the People charged the Defendants with having killed Williams on or about June 14, 2001, two weeks before the June 25-July 8, 2001 pay period began.

¶14     Finally, regarding Rivera's border-crossing evidence, or lack of border-crossing evidence, this too does not qualify as newly-discovered. First, Rivera was able to obtain a subpoena *duces tecum* issued by Clerk of the Superior Court of the Virgin Islands on April 15, 2014 to CBP in Miami, Florida, after he had been sentenced and judgment had been entered. Putting aside whether it was proper for the Clerk's Office to issue a subpoena in a closed case or issue a subpoena outside the Territory's subpoena power, officials

within the CBP office in Miami declined the request out of privacy concerns for Coogle. Rivera could not show that Coogle authorized the release of records pertaining to her border crossings. Rather than return to the Superior Court to enforce the Court's own subpoena, Rivera chose to pursue an internal, administrative appeal within the United States Department of Homeland Security. When that failed, Rivera reached out to Agent Calhoun and then to the United States Attorney for the Virgin Islands once Agent Calhoun did not respond.

¶15 None of this documentation shows due diligence, however. Rivera's attorney first subpoenaed CBP on April 15, 2014 to obtain documentation regarding Coogle's travels between Florida and the Virgin Islands around the time Williams was killed. CBP declined the request in a May 14, 2014 letter. Counsel appealed on December 22, 2014, but CBP upheld its decision in a January 23, 2015 letter. Counsel then emailed Attorney Roberson on February 5, 2015, who replied on February 6, 2015. On February 25, 2015, counsel sent a letter to Agent Calhoun, followed up by letter dated May 5, 2015, and then wrote to US Attorney Sharpe on June 8, 2015. Rivera's conviction was affirmed on May 4, 2016, and the mandate remanding this case to the Superior Court issued on June 22, 2016. Six months later—and two years after CBP upheld its decision to refuse to comply with this Court's subpoena—Rivera filed his motion for a new trial based on newly-discovered evidence. But Rivera has not been able to discover any new evidence.

¶16 All Defendants (when there were still five) left the entire area of Coogle's travel between Florida and the Virgin Islands unexplored at trial. This is a crucial point that Rivera (and Ventura having joined this motion) overlook. During a pretrial suppression hearing held the day before trial, Rivera did ask Coogle what airline she flew on to return the Virgin Islands. Coogle said she could not recall. Rivera then asked Coogle who paid for her ticket and Coogle said her grandmother, Mary Schneider, "paid for [her] ticket . . . ." (Hr'g Tr. 149:18-19 (Jan. 27, 2014).) She also said that she "may have paid for [her own] ticket a couple times." *Id.* at 149:19-20.

¶17     But no one asked Coogle *at trial* what airline she took to travel back and forth between Florida

and the Virgin Islands, who paid for her tickets, or whether she filled out the standard Form 6059B

Customs Declaration Form.[1] Rivera contends that, collectively, the affidavits, Coogle's work records and

her daughter's medical records, as well as the communications with law enforcement all "demonstrate the

likelihood that no official documents exist that show any travel by Coogle been [sic] Florida and the Virgin

Islands during the pertinent period in 2001." (Mot. 16.) But Rivera overlooks that CBP may not have

records of cross-border travel from 2001 *before* that office was created. *Cf. Ditlow v. Shultz*, 379 F. Supp.

326, 328 (D.D.C. 1974) ("[A]ll persons entering the United States are required to complete U.S. Customs

Declaration form 6059-B, and these completed forms are kept in the possession of the Department of the

Treasury."). Recall that Williams's murder—and Coogle's travel between Florida and the Virgin

Islands—occurred prior to the terrorist attacks on September 11th.

¶18     Thus, Rivera, and the Court by extension, is left back where we began: Coogle testified that she

traveled back and forth between Florida and the Virgin Islands and stayed at her mother's house on St.

Croix in June 2001 when Williams was murdered. Rivera disputes her testimony. Her own sister disputed

her testimony. But the jury believed her. Again, as the People point out, Rivera has not produced video

footage, signed, dated documentation, or anything irrefutable that contradict Coogle's testimony and

---

[1] *See United States v. 94,000.00 in U.S. Currency*, 2 F.3d 778, 781 (7th Cir. 1993) ("Form 6059B is the standard Customs Declaration Form required of all people entering the United States. The form requires international travellers [sic] to declare cash or monetary instruments in excess of $ 10,000.00. In addition, the form advises the traveler [sic] that, if he is carrying more than $ 10,000.00, a Form 4790, Report of International Transportation of Currency or Monetary Instruments, must also be filled out."). Persons flying to the United States mainland from the United States Virgin Islands must clear customs first. *Cf. United States v. Baxter*, 951 F.3d 128, 133 n.11 (3d Cir. 2020) ("Congress specified that the customs territory of the United States excludes the Virgin Islands."). Until recently, that included filling out a customs declaration form. In September 2015, U.S. Customs and Border Protection implemented a pilot program that let customs officers obtain oral declarations from travelers in lieu of filing out Form 6059B. *See* U.S. Cust. & Border Protection, *CBP Implements Virgin Islands Air Passenger Pilot Program* (Sept. 23, 2015) ("From Sunday September 6, the pilot program allows CBP Officers and CBP Agriculture Specialists to obtain a binding oral declaration from passengers . . . . However, travelers that are not pre-inspected in the USVI will be required to fill the CBP Form 6059B upon arrival into the United States and/or Puerto Rico. This pilot does not cover air travelers arriving into the USVI from foreign countries."), *available at* https://www.cbp.gov/newsroom/local-media-release/cbp-implements-virgin-islands-air-passenger-pilot-program (last visited May 13, 2020).

shows conclusively that Coogle was somewhere other than St. Croix on or about June 14, 2001.

¶19    "'Courts *justifiably* look upon after-discovered evidence with skepticism and suspicion . . . .'" *Wallace v. People*, 2019 VI 24 at ¶ 35 (emphasis added) (citation omitted). Here, it boils down to a determination of credibility. Rivera, like Ventura, "takes issue with the plausibility of Coogle's testimony, that a 17 year-old girl regularly flew back and forth between St. Croix, St. Thomas, and Miami while pregnant, and happened to be on St. Croix where she witnessed a murder and helped clean up afterward." *Ventura*, 2020 VI Super 63 at ¶ 35. "Coogle had testified extensively at a suppression hearing held the day *before trial*. It was then that she testified that she was pregnant in June 2001. *Id.* at ¶ 33 (emphasis added, footnote omitted). But like Ventura, Rivera did not

> call[] any witness to rebut the plausibility of pregnant teenagers flying over international waters during their third trimester. No one asked Coogle whether a parent or guardian accompanied her. No one asked what airlines she flew on. In fact, no one asked what airport she flew out of. No one questioned Coogle about her physical appearance in 2001, whether, as a pregnant seventeen-year old, her pregnancy was visibly apparent or could have been hidden by baggy clothing, for example. What's more, the Court takes juridical notice the events at issue here occurred before the terrorist attacks of September 11th and the numerous changes to airline security that followed. The Court cannot just assume that Coogle lied when she testified under oath that she traveled back and forth between St. Croix and Miami.

*Id.* Again, Rivera did ask Coogle about what airline she took and who bought her ticket, but during a pre-trial hearing, not trial. Even if Rivera and Ventura were to question Coogle about her cross-border travels at a new trial, the Court is not convinced that this line of questioning would produce an acquittal.

¶20    To be sure, newly-discovered impeachment evidence can be the basis for a new trial under the right circumstances. *Cf. Harris v. Gov't of the V.I.*, 55 V.I. 1102, 1135-36 (D.V.I. App. Div. 2011) (quoting *United States v. Quiles*, 618 F.3d 383, 391 (3d Cir. 2010)).

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because [s]he had lied consistently . . . [the] judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.

*Harris*, 55 V.I. at 1135 (quoting *Quiles*, 618 F.3d at 391). But "it will be the rare case in which impeaching evidence warrants a new trial . . . ." *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991). And this is not that rare case because Rivera has not discovered new evidence.

¶21    Francisco and Melendez were both mentioned at trial. (*See* Trial Tr. 77:1-10 (Jan. 29, 2014).) Coogle's daughter's emergency room visit was mentioned at trial. *See id.* at 76:2-6 (Q. And you went there because your young daughter was having some kind of an ear problem; correct? A. That's incorrect. I moved – I went there to escape out of a abusive relationship that I had with Max Velasquez." (line breaks omitted)). Coogle's travels between Florida and the Virgin Islands were also addressed at length at trial. Rivera concludes that the lack of documentation corroborating Coogle's return to Miami—since she was in Miami on April 8, 2001 with her daughter in the emergency room; working at Wendy's in Miami sometime between June 25 and July 8, 2001; and gave birth on July 24, 2001—proves that she never left Miami. But actually, the lack of documentation cuts both ways. It neither undermines nor corroborates Coogle's testimony. Rivera overlooks that one can be on St. Croix for less than twenty-four hours and leave either by air or by sea. Coogle testified that she was staying in St. Thomas too at this time. *See id.* at 78:15-19 ("Q. And who were you staying with when you were back on St. Croix during the time of this homicide? Where were you living? A. I was in between my mother's house and I also stayed in St. Thomas." (line break omitted)). Most importantly, however—and here the Court must point out that Rivera is being somewhat disingenuous—Rivera has not produced any documentation attesting to the absence of records of Coogle's cross-border travels. He has only provided proof of his attempts to obtain such records: a dishonored subpoena *duces tecum* and unanswered letters sent to federal officials. He did not initiate judicial proceedings as he was told he could. (*See* Letter from Shari Suzuki to Gordon C. Rhea, Esq. (Jan. 23, 2015) (citing 5 U.S.C. § 552(a)(4)(B)), attached as Ex. 6 to Mot.) The Court cannot conclude from the papers Rivera submitted that Coogle was not on St. Croix in June 2001 and, thus, committed

perjury at trial. The lack of a record has to be shown not assumed. *See* 5 V.I.C. § 4934 ("A written statement that after diligent search no record or entry of a specified tenor is found to exist in the records designated by the statement, authenticated as provided in this chapter in the case of a domestic record, or complying with the requirements of this chapter for a summary in the case of a record in a foreign country, is admissible as evidence that the records contain no such record or entry."). Rivera failed to carry his heavy burden.

¶22     What remains is Rivera's claim that the People violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing before trial that FBI Special Agent Tom Calhoun was aware of allegations that Coogle was not on St. Croix and looked, but did not find, supporting documentation and further, that Coogle was aware of a reward for testifying and "had retained counsel in Florida to help her recover it." (Mot. 11.) "[A] *Brady* violation . . . occurs if exculpatory information is not disclosed until after trial." *Williams v. People*, 59 V.I. 1024, 1040 (2013).

> *Brady* obligates the prosecution to disclose evidence known by those acting on the government's behalf. The prosecution's duty to disclose under *Brady* is not limited only to evidence within the prosecution's actual knowledge or possession. The prosecutor is also obligated to "learn of and disclose information known to the others acting on the government's behalf in the case." The prosecutor is presumed to have knowledge of all relevant and material information within the actual knowledge and possession of other agencies outside of the prosecutor's office where these agencies have collaborated with the prosecution as a part of the investigative team, such as the police department or forensic lab.

*John v. People*, 63 V.I. 629, 642 (2015) (citations omitted)). For this reason, "'[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure.'" *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). "This is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* (ellipses omitted) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Rivera has not shown a *Brady* violation, however.

¶23    First, Coogle denied knowing about a reward when asked by Maximiliano's attorney *at trial*. (*See* Trial Tr. 143:1-12 (Jan. 29, 2014) ("[Q. D]id you notice a reward for information that leads to the arrest and capture and conviction? A. Reward for what? Q. Of people for the killing of Wendell Williams, did you know that? A. No, I did not. Q. You were never made aware of it? A. I do not know about a notice or reward or anything. Q. Okay. And for sure that you're here not getting paid by anyone; right? A. Nope." (line breaks omitted)).) So, Rivera's attorney is simply mistaken in stating that through "email exchanges with Attorney Roberson, counsel learned for the first time that a reward had been offered for the apprehension and prosecution of Officer Williams' killer, that Ms. Coogle had been aware of that reward, and that she had retained counsel in Florida to help her recover it." (Mot. 11.) Attorney Rhea was Rivera's attorney at trial. He was there when Maximiliano's attorney asked Coogle about reward money. Even if he did not hear her testimony, the record put him on notice.

¶24    Additionally, the email correspondence with Attorney Roberson may show that Attorney Roberson was unaware of the reward—again, even though the record shows otherwise—but it does not show that Coogle knew *before trial* there was a reward. (*See* Email from Kippy Roberson, Esq. to Gordon C. Rhea, Esq. (Feb. 5, 2015) ("Ms. Coogle is being represented by two attorneys in her effort to collect any reward funds that might be available for testifying. That is another issue that I was unaware of at the time of trial, that there might be a potential reward available for cooperation in the prosecution."), attached as Ex. 10 to Mot.) Maximiliano's questions may have alerted her to the reward, and she retained counsel after trial to look into it. That is a plausible reading of Attorney Roberson's statement. Rivera chose not to subpoena Attorney Roberson to testify at the evidentiary hearing. The Court cannot make his case for him. Moreover, the People called Detective Ortiz to testify at the evidentiary hearing (even though Rivera had the burden of proof). Ortiz testified that Coogle was never informed about a reward. (*See* Hr'g Tr. 38:3-4 (June 14, 2018) ("During my investigation no reward was mentioned to the witness.").) This corroborates

Coogle having denied knowing about a reward. Attorney Roberson's email does not undermine her

testimony or constitute a *Brady* violation.

¶25     Second, the fact that the People did not disclose that an FBI agent, before trial, had looked into

claims that Coogle was not on St. Croix at the time of the murder is also not a *Brady* violation. What

Rivera submitted to support this supposed violation is the following email:

> Hi again.
>
> An update for you. I spoke with Special Agent Tom Calhoun from the FBI today. At the
> time of trial he was informed of the allegation that Ms Coogle was not on island at the time
> of the murder. He did due diligence with US Customs and checked for any I-94 filings
> during the relevant time period. My understanding is that the I-94 is the document required
> by Customs if a person is going to leave USVI. There was no record of Ms. Coogle ever
> leaving the islands during that time frame. He also checked with Airline Report
> Corporation, which I understand is a service that records any travel on the commercial
> airlines. They also indicated that there was no travel by Ms Coogle during the time period
> on question. Though I do not recall being informed of it at the time, apparently Agent
> Calhoun had followed up on all possible documentation on that information and there was
> no indication that Ms Coogle was absent from STX when the event occurred.
>
> Regards,
> Kip

(Email from Kippy Roberson, Esq. to Gordon C. Rhea, Esq. (Feb. 6, 2015) (paragraph breaks omitted),

attached as Ex. 8 to Mot.) From this email, Rivera concludes that "[i]n preparation for trial, AAG Kippy

Roberson *and* FBI Agent Tom Calhoun tried to find any documentary proof substantiating that Ms.

Coogle had travelled to the Virgin Islands but were unable to do so." (Mot. 20 (emphasis added).) But

Attorney Roberson does not state in his email that he, himself, tried to find proof substantiating Coogle's

travel. He also does not state that he knew *before trial* that Agent Calhoun tried to find proof.

¶26     Assuming that FBI agents were part of the Virgin Islands Police Department's investigative team,

the Virgin Islands Department of Justice would have imputed knowledge of everything the FBI agents

knew. Agent Calhoun's name was mentioned at trial. (*See, e.g.*, Trial Tr. 118:20, 173:6 (Jan. 30, 2014).)

But Detective Ortiz was the case agent. (*See* Hr'g Tr. 39:7-9 (June 14, 2018).) Whether Special Agent Calhoun was a part of the local team investigating this case is unclear. He may just have been a liaison. (*Cf.* Supp. Hr'g Tr. 214:15-16 (Jan. 27, 2014) ("I gave it to Agent Calhoun, who's assigned here, and he sent it to Florida.").) But even if Agent Calhoun's knowledge should be imputed to the Virgin Islands Department of Justice, Attorney Roberson's email does not disclose a *Brady* violation. The email states only that Calhoun knew at the time of trial of the allegation that Coogle was not on St. Croix. He did due diligence to check for supporting documentation and found none. The last portion of the email does imply—but does not state outright—that Agent Calhoun may have "followed up on all possible documentation" *prior to* trial. But again, an inference must be drawn from the email. In other words, in 2015, when Attorney Roberson wrote that he did not recall being informed "at the time," but Agent Calhoun was informed "at the time," the Court would have to infer that "at the time" means prior to trial.

¶27 Rather than subpoena Agent Calhoun to testify at the evidentiary hearing, Rivera leaves it to the Court to draw these inferences. They are fair inference to draw, to be sure. But even assuming that, before or during trial, Agent Calhoun looked for evidence to show Coogle's June 2001 border crossings and found none, and further that this knowledge should be imputed to the prosecutor, Rivera overlooks that "*Brady* and its progeny only obligates the Government to produce exculpatory information, not investigative leads . . . ." *United States v. Salerno*, 796 F. Supp. 1099, 1105 (N.D. Ill. 1991). Nonetheless, the People concede that they did have an obligation:

> If the People knew that a diligent search of the records reveal an absence of . . . forms for Ms. Coogle during 2001, and no passenger listing for her on any commercial airline traveling between Florida and Miami, there would have been an obligation to disclose these findings to Defendant Rivera.

(People's Resp. to Def.'s Mot. for New Trial 7-8, filed Apr. 10, 2017 (hereinafter "Opp'n").) But again, even if the Court drew the same inference Rivera makes—that Agent Calhoun knew there was no proof

showing Coogle left St. Croix in June 2001, and further that this knowledge was imputed to the People—the Court still does not find a *Brady* violation here.

¶28    "It is well established that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Williams*, 59 V.I. at 1039 (quoting *Brady*, 373 U.S. at 87). "'[T]o prevail on a *Brady* claim, the defendant must show that the evidence was (1) suppressed, (2) favorable, and (3) material to the defense.'" *Id.* (citation omitted). Assuming, *arguendo*, that the absence of a record constitutes evidence, and assuming that the People failed to disclose this evidence to the Defendants before trial, the Court does not find that the failure to disclose this evidence was favorable or material. No one disputes that Coogle left St. Croix in 2001. Mariela Velasquez testified that Coogle went to live with her in Miami in "March 2001." (Trial Tr. 160:21 (Feb. 3, 2014).) As the People point out, any "search should have listed at least one travel for Ms. Coogle in 2001." (Opp'n 8.) The Court is "reluctant to accept Defendant Rivera's position that this preliminary absence of travel records leads to a conclusion that Ms. Coogle was or may have been in Florida on or about June of 2001." *Id.* If Agent Calhoun had obtained a certification of a lack of a record, and the People failed to disclose that document, Rivera might be on firmer footing. But it would have to be accompanied by other testimony regarding how long the federal government retains Form 6059B Customs Declaration Forms.

¶29    Again, however, Rivera has not shown that the People suppressed evidence that was exculpatory or impeachment. But even assuming that Special Agent Calhoun attempted unsuccessfully, either before or during trial, to find documentation supporting Coogle's 2001 travel between Florida and the Virgin Islands was evidence, and further that it was suppressed, inadvertently, because it was not disclosed, the Court does not find that the information was favorable or would have been material. Coogle was unyielding in her assertion that she was on St. Croix and witnessed Ventura and Rivera shoot and kill